IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EVOLVE BIOSYSTEMS, INC.; and <br> THE REGENTS OF THE UNIVERSITY <br> OF CALIFORNIA, a corporation, <br> <br> Plaintiffs/Counter-plaintiffs, <br> <br> v. <br> <br> ABBOTT LABORATORIES, <br> <br> Defendant/Counter-defendant. | No. 19 C 5859 <br> <br> Judge John Z. Lee |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Evolve Biosystems, Inc. and the Regents of the University of California ("Evolve") filed patent infringement claims against Defendant Abbott Laboratories ("Abbott") related to patents covering Evolve's EVIVO product. In turn, Abbott filed counterclaims for, among other things, false advertising under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and unfair competition under Illinois and California state law. Evolve countered with its own counterclaims under these same laws. Specifically, Evolve alleges that Abbott made false and misleading advertising statements about Abbott's competing Similac Probiotic Tri-Blend product. Abbott has moved to dismiss Evolve's Lanham Act false advertising and state law unfair competition counterclaims under Federal Rule of Civil Procedure 12(b)(6). For the reasons provided below, Abbott's motion to dismiss is denied.

## I. Procedural History

### A. Evolve's Complaint

Evolve conducts and sponsors research related to infant gut dysbiosis. Am. Compl. ¶¶ 9–10, ECF No. 20. Evolve developed and markets a *Bifidobacterium longum subsp. infantis* ("*B. infantis*") probiotic product for preterm infants called EVIVO. *Id.* ¶¶ 10–11. Research indicates that EVIVO, in combination with human milk oligosaccharide prebiotics, promotes *B. infantis* colonization in the infant gut, improving patient outcomes. *Id.* ¶ 11. Evolve's EVIVO product is used in newborn intensive care units ("NICUs") across the country. *Id.*

Beginning in 2018, Evolve's success with EVIVO led to conversations with Abbott concerning a potential partnership. *Id.* ¶ 14. Abbott produces its own line of infant care products called Similac; the idea was that Abbott might co-promote Evolve's EVIVO product alongside Abbott's Similac products. *Id.*

After over a year of discussion between Evolve and Abbott, however, rumors began to emerge that Abbott was preparing to launch a *B. infantis* product that would compete with EVIVO. *Id.* Evolve lost the potential business of an important customer who put "discussions about using Evolve's EVIVO in their NICUs on hold, so they could consider Abbott's imminent probiotic offering." *Id.* According to Evolve, Abbott, in fact, did intend to launch a *B. infantis* product—called Similac Probiotic Tri-Blend ("Tri-Blend")—that would compete directly with Evolve's EVIVO. *Id.*

As of October 2019, Abbott had prepared marketing materials, as well as care provider product instructions, and had trained its sales team for the Tri-Blend

2

product launch. *Id.* ¶ 15. Abbott also released directions for care providers for its Tri-Blend product at an Advances in Neonatal Nursing conference. *Id.* ¶ 16. Furthermore, Tri-Blend was listed for sale on Abbott's website, leading Evolve's then-current and potential customers to believe that Tri-Blend would launch no later than two months from October 2019. *Id.* ¶ 15. Evolve continued to lose business from potential customers who paused discussions with Evolve to wait for Tri-Blend's imminent release. *Id.* ¶ 18.

In October 2019, Evolve filed a patent infringement action against Abbott, alleging that Abbott's Tri-Blend product would infringe two of Evolve's patents with claims related to Evolve's EVIVO product. *Id.* ¶ 1.

## B. The Counterclaims

In November 2020, Abbott responded with counterclaims against Evolve for, among other things, false advertising under the Lanham Act and unfair competition under Illinois and California state law. Def.'s Answer, Affirmative Defenses, & Countercls. ¶ 1, ECF No. 144.

In response, Evolve filed its own set of counterclaims against Abbott. These included counterclaims for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and unfair competition under Illinois and California state law. Pls.' Countercls., Answer, & Affirmative Defenses ("Pls.' Countercls.") ¶ 1, ECF No. 184. And Abbott has moved to dismiss those counterclaims.

## II.     Factual Background[1]

Evolve's counterclaims allege the following facts. Evolve's EVIVO product utilizes a particular strain of *B. infantis*: the EVC001 strain. *Id.* ¶ 12. Evolve's EVC001 strain has specialized metabolic processes that other probiotic species and strains lack, allowing it to utilize a wide range of milk oligosaccharides. *Id.* Oligosaccharide-utilization is important to the positive effect of probiotic bacteria because oligosaccharide metabolism generates lactate and acetate that reduces fecal pH, suppressing pathogen growth. *Id.*

The EVC001 strain that Evolve uses in its EVIVO product is an "H5-positive strain" that possesses the full repertoire of oligosaccharide-utilization genes, while other strains (the "H5-negative strains") lack an ABC-type transporter known to bind core oligosaccharide structures. *Id.* ¶ 13. Evolve asserts that "[d]ue to their genetic differences, H5-positive strains achieve superior growth on milk oligosaccharides." *Id.*

Because the EVIVO EVC001 strain can metabolize some human milk oligosaccharides more effectively than H5-negative *B. infantis* strains, it can "grow more robustly in an infant's gut." *Id.* ¶ 14. Increased colonization of the infant gut, in turn, can improve patient outcomes. *Id.* ¶ 15. In fact, preterm infants receiving *B. infantis* EVC001 had "significantly reduced necrotizing enterocolitis . . . compared

---

[1]     For the purposes of this motion to dismiss, this Court "must accept as true all well-pleaded factual allegations." *See Heredia v. Capital Mgmt. Servs., L.P.*, 942 F.3d 811, 814 (7th Cir. 2019) (citing *Marquez v. Weinstein, Pinson & Riley, P.S.*, 836 F.3d 808, 810 (7th Cir. 2016)).

to cohorts receiving no probiotics." *Id.* Also, infants receiving *B. infantis* EVC001 "had significantly reduced late onset sepsis . . . compared to those receiving the probiotics bacterium *L. reuteri* and those receiving no probiotics." *Id.*

Abbott's Tri-Blend product differs from Evolve's EVIVO product in that Tri-Blend consists of three different bacteria: *B. infantis*, like in Evolve's EVIVO product, as well as *B. lactis* and *S. thermophilus*. *Id.* ¶ 16. However, unlike Evolve's EVIVO product, Tri-Blend utilizes the H5-negative *B. infantis* strain BB-02. *Id.* ¶ 17. The BB-02 strain utilizes milk oligosaccharides less effectively than H5-positive strains, such as the EVC001 strain in Evolve's EVIVO product. *Id.* This difference is important to the overall efficacy of Abbott's Tri-Blend product, as *B. lactis* and *S. termophilus* cannot utilize milk oligosaccharides like *B. infantis* can. *Id.* ¶ 17. In addition, the BB-02 strain in Abbott's Tri-Blend product has viability issues that adversely affect manufacturing and transport of the product. *Id.* ¶ 18. Also, although the EVC001 *B. infantis* strain can "grow more robustly in an infant's gut," *id.* ¶ 14, the BB-02 strain, in contrast, "may not survive well in the infant gut," *id.* ¶ 18.

In support of its counterclaims for false advertising and unfair competition, Evolve asserts that Abbott has made a number of misleading statements related to its Tri-Blend product. *Id.* ¶¶ 19–20. For example, Abbott states that Tri-Blend has "potency" and "stability" and is composed of "high-quality probiotic strains." *Id.* ¶ 20. Yet Abbott is aware that *B. infantis* is more important than other probiotics and that the BB-02 strain in Abbott's product is not as effective as the EVC001 strain in Evolve's product. *Id.* ¶ 19.

5

Along these lines, Abbott also states that Tri-Blend is a "unique blend," and its marketing materials and advertisements proclaim that multi-strain probiotics "have functional advantages over single strain probiotics." *Id.* ¶ 19. Abbott instructs its sales representatives to convey that same message to customers in order to distinguish between Tri-Blend and competing products like Evolve's EVIVO. *Id.*

Abbott's Tri-Blend product labeling states that the product contains 1 billion colony-forming units for all three bacterial species combined, but Abbott's Tri-Blend labeling does not disclose the number of colony-forming units or total cells for each individual species in the product. *Id.* ¶ 18. Abbott intends for this labeling to suggest to consumers that the BB-02 *B. infantis* strain comprises one-third of the colony-forming units in the Tri-Blend product. *Id.* ¶ 20. Yet Abbott has not verified that the BB-02 *B. infantis* strain actually does comprise one-third of the colony-forming units in the Tri-Blend product. *Id.*

Abbott began making some of these commercial statements in or around August 2020. *Id.* ¶ 21. In direct response to Abbott's commercial statements and representations, Evolve lost business in the form of discontinued orders from "some hospitals and NICUs." *Id.* Tri-Blend, as of February 2021, had been adopted by both former and prospective customers of Evolve. *Id.* ¶ 16.

### III. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's complaint must state a claim with "facial plausibility" and plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

6

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). At this stage, this Court "must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *See Heredia*, 942 F.3d at 814 (citing *Marquez*, 836 F.3d at 810). In contrast, this Court need not accept as true "legal conclusions or conclusionary allegations that merely recite a claim's elements." *See Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012) (citing *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011)).

Moreover, "Lanham Act claims alleging false representation must meet Rule 9(b)'s heightened pleading requirements." *Oil-Dri Corp. of Am. v. Nestle Purina Petcare Co.*, No. 16 C 09179, 2017 WL 1436965, at *3 (N.D. Ill. Apr. 24, 2017) (collecting cases). Rule 9(b)'s heightened pleading standard requires a plaintiff to plead their claims with "particularity," though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Thus, to meet Rule 9(b)'s heightened standard, a plaintiff must plead "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). That said, courts should not treat Rule 9(b) as an "overly rigid . . . formulation," however, because "the requisite information—what gets included in that first paragraph—may vary on the facts of a given case." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (collecting cases).

## IV. Analysis

As an initial matter, both parties agree that Evolve's Illinois and California state law unfair competition counterclaims rise and fall with Evolve's Lanham Act counterclaim. *See* Mem. Supp. Def.'s Mot. Dismiss. ("Def.'s Mem.") at 15, ECF No. 209; Pls.' Opp'n Def.'s Mot. Dismiss. ("Pls.' Opp'n") at 15, ECF No. 217; *see also VitalGo, Inc. v. Kreg Therapeutics, Inc.*, No. 16-CV-5577, 2017 WL 6569633, at *7 n.5 (N.D. Ill. Dec. 21, 2017) (collecting cases); *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994). Accordingly, the Court will analyze Evolve's unfair competition counterclaims in tandem with its Lanham Act false advertising counterclaim.

A false advertising claim made under § 1125(a)(1)(B) requires a plaintiff to establish the following elements:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819–20 (7th Cir. 1999) (citing *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999)).

A plaintiff may claim a false commercial advertising statement by the defendant in one of two ways: through "(1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which

implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Id.* at 820.

Abbott makes three arguments in support of its motion to dismiss. First, Abbott argues that Evolve's allegations fail to meet Rule 9(b)'s heightened pleading standard. Second, Abbott argues that many of the alleged commercial statements that Evolve claims are false and misleading are either non-actionable puffery or, alternatively, are neither false nor plausibly misleading. Third, Abbott argues that the Tri-Blend label Evolve claims is false and misleading is not commercial advertising or, alternatively, is neither false nor plausibly misleading.

### A. Abbott's Pleading Under Rule 9(b)

First, Abbott's argues that Evolve's pleading fails Rule 9(b)'s heightened pleading standard. This is incorrect. Evolve has pleaded the necessary who (Abbott, Pls.' Countercls. ¶¶ 19–21), what (Abbott's commercial statements and the Tri-Blend label, *id.* ¶¶ 19–20), when (starting in or around August 2020 when Evolve began to lose business, *id.* ¶ 21), where (hospitals and NICUs, *id.*), and how (through advertising, marketing materials, and labeling attached to Tri-Blend's product packaging, *id.* ¶¶ 19–20).

Abbott is correct that Evolve has not pleaded exact times and exact locations, that is when and where the challenged statements or labels were delivered to "hospitals and NICUs." *Id.* ¶ 21. Yet, Rule 9(b)'s particularity standard requires "flexibility when information lies outside of [the] plaintiff's control." *Pirelli*, 631 F.3d at 442 (citing *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998)). And

9

as between the parties, it is Abbott that knows the exact times and dates of its sales pitches and product deliveries to its customers in this case. Therefore, Evolve's pleading satisfies Rule 9(b).

## B. Abbott's Commercial Statements

Next, Abbott argues that some of the commercial statements that Evolve alleges are false or misleading—the "statements that Tri-Blend is a 'unique blend' with 'high-quality probiotic strains,' exhibits 'potency & stability,' and has 'functional advantages over single strain probiotics'"—constitute mere puffery that is non-actionable as a matter of law. Def.'s Mem. at 9.

If "plaintiffs base deceptive advertising claims on unreasonable or fanciful interpretations of labels or other advertising, dismissal on the pleadings may well be justified." *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 477 (7th Cir. 2020) (collecting cases). Indeed, vague, highly subjective, or exaggerated commercial statements or advertisements may be deemed puffery as a matter of law. *See Saltzman v. Pella Corp.*, No. 06 C 4481, 2007 WL 844883, at *4 (N.D. Ill. Mar. 20, 2007) (collecting cases). "In determining whether a statement is puffery, the context matters." *F.T.C. v. Trudeau*, 579 F.3d 754, 766 (7th Cir. 2009) (quoting *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009)). And, when analyzing false advertising claims, courts "should take into account all the information available to consumers and the context in which that information is provided and used." *Bell*, 982 F.3d at 477–78 ("This practical and fact-intensive approach to consumer behavior

under deceptive-advertising laws is consistent with the law's approach under other consumer-protection laws." *Id.* at 478.).

Generally speaking, "in false advertising claims under the Lanham Act, the law has long recognized that even literally true claims may deceive, that implied messages in advertising may deceive, and that *what matters is how consumers actually understand the advertising.*" *Id.* at 479 (7th Cir. 2020) (emphasis added). As such, in Lanham Act false advertising claims, "[t]he meaning of a given advertisement is a question of fact." *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1091 (7th Cir. 1994) (citing *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992)). As a corollary, whether an advertisement or commercial statement is false or misleading typically is a question that should not be decided on a motion to dismiss. *See Bell*, 982 F.3d at 479 ("It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive." (quoting *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 948 (N.D. Ill. 2009)).

To decide whether a commercial statement is mere puffery, the Court must consider two principal factors. First, commercial statements are not puffery if they can be tested—if they make "objective claims" that describe "specific or absolute characteristics of a product capable of testing." *Rosenthal Collins Grp., LLC v. Trading Techs. Int'l, Inc.*, No. 05 C 4088, 2005 WL 3557947, at *10 (N.D. Ill. Dec. 26, 2005). Second, commercial statements are not puffery if reasonable consumers could rely on them in their purchasing decisions—if they are "specific" enough to induce

11

"consumer reliance." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990); *see also Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999) ("Puffing in the usual sense signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud.").

Evolve's pleading alleges that the rate of probiotic growth, probiotic utilization of milk oligosaccharides, and the degree of probiotic colonization and survival in the infant gut are measurable. Pls.' Countercls. ¶¶ 13–14. Moreover, Evolve asserts, probiotics can be tested for their clinical effect on the incidence of specific diseases in preterm infants. *Id.*¶ 15. From this, it is reasonable to infer that probiotic viability in manufacture and transport also is measurable. *See id.* ¶ 18. It also is reasonable to infer that potential consumers—here, hospitals and their NICUs—are aware that infant probiotic products can be tested for function and efficacy.

Against this backdrop, it is a small step to infer that customers of infant probiotic products rely on such commercial language as "poten[t]," "stabl[e]," and "high-quality" to denote the products' function and efficacy. *See Gubala v. CVS Pharmacy, Inc.*, No. 14 C 9039, 2016 WL 1019794, at *13 (N.D. Ill. Mar. 15, 2016) ("The Court must accept as true so long as it is plausible Plaintiff's allegation that the term 'high-quality protein' has a specific factual meaning to a consumer of the Product."). Same applies to Abbott's statements that Tri-Blend is a "unique blend" with "functional advantages over single strain probiotics," to consumers, invokes a testable comparison between single-strain and multi-strain probiotics. Abbott is

12

correct to state that, when commercial statements provide "no factual content that positively misrepresents the nature, characteristics, qualities or origin of the [product]," a plaintiff's false advertising claim must be dismissed as puffery. *Martin v. Wendy's Int'l, Inc.*, 183 F. Supp. 3d 925, 934 (N.D. Ill. 2016). But these commercial statements do not exist in a vacuum. *See Bell*, 982 F.3d at 477 (noting that courts "should take into account all the information available to consumers and the context in which that information is provided and used"). And, as Evolve alleges, consumers could plausibly understand Abbott's statements as conveying a factual, testable information and reasonably rely upon them in making purchasing decisions. Pls.' Countercls. ¶¶ 15, 21. Thus, Abbott's commercial statements about its product cannot be considered mere puffery, at least at the pleading stage. *See Cook*, 911 F.2d at 246; *Speakers*, 178 F.3d at 866.[2]

On this point, *Gubala v. CVS Pharmacy, Inc.*, 2016 WL 1019794, proves instructive. In *Gubala*, the Court noted that although "the term 'high-quality' in most cases will fall into the category of puffing," the plaintiff had alleged that the defendant used "the term 'high-quality' . . . specifically to identify the supposed type or category

---

[2] This conclusion finds supported in Abbott's own exhibits, which the Court may consider because they are central to the claims. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (citing *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)). Exhibit 1 specifically cites a scientific study to support the statements that Abbott's Tri-Blend product is a "unique blend" and that multi-strain probiotics "may have functional advantages over single strains." Def.'s Mem. at 6. Exhibit 2 states that Abbott's product has been subjected to "controlled, rigorous testing," that its "product potency & stability [is] ensured," and that the product is "tested." *Id.*

13

of an *ingredient* in the Product." *Id.* at *13 (emphasis added) ("A statement that would otherwise be an opinion can constitute a statement of fact if it is made in such a way that the consumer could reasonably treat it as a statement of fact." (quoting *Borcherding v. Anderson Remodeling Co.*, 624 N.E.2d 887, 892 (Ill. App. Ct. 1993))). "Because the term 'high-quality protein' could be understood as a factual representation regarding the source of the protein in question," the Court concluded that the plaintiff had "stated a valid misrepresentation claim." *Id.* The same reasoning applies here.

Finally, Abbott argues that in its original context, the commercial statement that multi-strain probiotics, like Tri-Blend, "may have functional advantages over single strain probiotics" is not plausibly false or misleading. Def.'s Mem. at 6, 12. For purposes of a motion to dismiss, however, "plaintiffs are entitled to present evidence on how consumers actually understand [a particular statement]." *Bell*, 982 F.3d at 480. Evolve has alleged that Abbott's commercial statement may reasonably mislead consumers about the quality or efficacy of the Tri-Blend multi-strain product compared to the EVIVO single-strain product. Pls.' Countercls. ¶ 19. Given these allegations, the Court declines to conclude, as a matter of law, that Abbott's statement could not "implicitly convey a false impression," just because it has the word "may." *See Hot Wax*, 191 F.3d at 820.

**C.      Abbott's Product Labeling**

Lastly, the parties dispute whether Abbott's Tri-Blend label conveys a false or plausibly misleading message. The label states that the product contains a "Probiotic

14

Blend" of one billion colony-forming units per packet. Pls.' Countercls. ¶ 20. It then lists the three probiotics purportedly present in the product, starting with the *B. infantis* BB-02 strain probiotic. *Id.* Evolve alleges that this labeling implicitly and misleadingly "suggests that BB-02 accounts for a third of the viable [colony-forming units]," in the Tri-Blend product. *Id.* Evolve further alleges that Abbott has not performed testing to prove that result. *Id.*

Product labels can contain actionable misrepresentations that violate the Lanham Act. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 113 (2014) ("[The Lanham Act's] comprehensive imposition of liability extends, by its own terms, to misrepresentations on labels, including food and beverage labels."); *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 503 (7th Cir. 2009). But Abbott argues that its label does not qualify as "commercial advertising or promotion" under the Lanham Act.

In support, Abbott cites *Midwest Canvas Corp. v. Commonwealth Canvas, Inc.*, No. 07 C 0085, 2008 WL 162757 (N.D. Ill. Jan. 16, 2008), where the district court, employing a multi-factor test, determined that an invoice accompanying a shipment did not qualify as commercial advertising or promotion under the Lanham Act. *Id.* at *3. The Seventh Circuit, however, has rejected that multi-factor test in *First Health Group Corp. v. BCE Emergis Corp.*, holding that "commercial advertising and promotion" means nothing more than "promotional material disseminated to anonymous recipients." 269 F.3d 800, 803–04 (7th Cir. 2001); *see also Neuros*, 698

F.3d at 522 (holding that "promotion" means "a systematic communicative endeavor to persuade possible customers to buy the seller's product").

Evolve's allegations clear this low bar. Evolve has alleged that Abbott's Tri-Blend label information implicitly communicates a message to consumers—that *B. infantis* constitutes one-third of the one billion colony-forming units per Tri-Blend packet. Pls.' Countercls. ¶ 20. Evolve also has alleged multiple channels by which Abbott's label is conveyed to potential customers—through Abbott's website, Am. Compl. ¶ 15; at nursing conferences, *id.* ¶ 16; to care providers and parents through hospitals and NICUs, Pls.' Countercls. ¶ 21; and through sales representatives and marketing materials, Pls.' Countercls. ¶ 19. As a result, Evolve has alleged sufficient facts to support its claim that Abbott's Tri-Blend product label constitutes commercial advertising or promotion.

Abbott also argues that the Tri-Blend label cannot be the basis for a false advertising claim, because "no reasonable consumer could actually believe the plaintiffs' alleged interpretation." *Bell*, 982 F.3d at 475. But, as noted, "[t]he meaning of a given advertisement is a question of fact," *BASF*, 41 F.3d at 1091 (citing *Abbott*, 971 F.2d at 13), that should generally not be decided on a motion to dismiss. *See Bell*, 982 F.3d at 479. Evolve has asserted that a product label describing a "blend" of three ingredients implicitly conveys to consumers the message that those three ingredients are present in equal parts. Pls.' Countercls. ¶ 20. This plausible allegation is sufficient to survive a motion to dismiss. *Cf. POM Wonderful*, 573 U.S. at 121 (remanding to determine whether a juice label's prominent display of the

16

words "pomegranate blueberry" was deceptive when the juice contained only 0.3% pomegranate juice and 0.2% blueberry juice); *Bell*, 982 F.3d at 492 (remanding to determine whether defendants' "100% Grated Parmesan Cheese" label deceptively suggested that the product contained only cheese).

Furthermore, Evolve has alleged that Abbott's label makes *implicit* reference to a measurable fact—that each packet of Tri-Blend contains one-third of one billion colony-forming units of *B. infantis* and that Abbott has not conducted testing that proves the implied labeling statement true. *See BASF*, 41 F.3d at 1091. Finally, Evolve has alleged that Abbott's Tri-Blend label misleads consumers making purchasing decisions. Pls.' Countercls. ¶¶ 29–30. These allegations are sufficient to state an actionable Lanham Act claim for false advertising.

## V. Conclusion

For the reasons provided above, the Court denies Defendant Abbott's motion to dismiss Evolve's Lanham Act false advertising counterclaim. Because Evolve's Illinois and California state law unfair competition counterclaims rise and fall with Evolve's Lanham Act counterclaim, the Court also denies Abbott's motion to dismiss Evolve's Illinois and California unfair competition counterclaims.

**IT IS SO ORDERED.**          **ENTERED: 3/22/22**

                                                   **John Z. Lee**
                                                   **United States District Judge**