**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EVOLVE BIOSYSTEMS, INC., and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **No. 19 C 5859** |
| **v.** | ) ) ) | **Judge Jorge L. Alonso** |
| **ABBOT LABORATORIES,** | ) ) ) | |
| **Defendant.** | ) ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs, Evolve Biosystems, Inc., and the Regents of the University of California ("Evolve"),[1] bring this suit against defendant, Abbott Laboratories ("Abbott"), alleging that Abbott commercialized and marketed an infant probiotic product that resulted in infringement of Evolve's rights under United States Patents Nos. 8,197,872 ("the '872 patent") and 9,200,091 ("the '091 patent"). The case is before the Court on cross-motions for summary judgment, as well as several associated *Daubert* motions to exclude expert testimony. For the following reasons, Abbott's motion for summary judgment is granted; Evolve's is granted as to Abbott's false advertising claim and related state-law claims, but otherwise denied; and the *Daubert* motions are denied as moot.

**<u>Background</u>**

---

[1] The Court will adopt the parties' practice in their briefs of using the term "Evolve" to refer to plaintiffs collectively as well as Evolve Biosystems, Inc., individually. The plaintiffs have the same interest in this lawsuit, such that it serves no purpose to distinguish between them in this Opinion.

The following facts come from the parties' Local Rule 56.1 statements, and they are undisputed unless otherwise noted.

Evolve Biosystems, Inc., currently doing business as Infinant Health, Inc., was founded by scientists at the University of California, Davis, who conducted research into the beneficial role of the bacterium *Bifidobacterium longum* subsp. *infantis* ("*B. infantis*") in newborn gut health. They learned that certain oligosaccharides—long chains of complex sugars found in both bovine milk and human breast milk—serve as a food source for *B. infantis* in the infant gut, which promotes the growth of the bacterium, resulting in numerous health benefits. They developed a probiotic *B. infantis* product, known as "EVIVO," for preterm infants, and the University of California obtained the '872 and '091 patents to protect the invention. Asserted Claim 18 of the '872 patent is a method for producing a synthetic food product or supplement by combining human milk oligosaccharides ("HMOs") having certain characteristics with an inoculum of *B. infantis* and a food ingredient. Asserted Claims 14 and 15 of the '091 patent describe a method for treating certain health conditions by administering a composition comprising one of various enumerated bovine milk oligosaccharides ("BMOs") and an inoculum of *B. infantis*.

In 2019, Abbott prepared to launch its own infant probiotic product containing *B. infantis*, Similac Probiotic Tri-Blend ("Tri-Blend"). Evolve filed this lawsuit, alleging that Abbott would infringe Evolve's patents by selling Tri-Blend to hospitals, expecting staff in the hospitals' neonatal intensive care units ("NICUs") to combine Tri-Blend with infant formula or breast milk and administer it to preterm infants. Abbott filed a counterclaim seeking a declaratory judgment of non-infringement and invalidity and asserting claims of false advertising under the Lanham Act, as well as related violations of state law. In response, Evolve filed its own counterclaim, similarly asserting claims of false advertising and related state-law claims.

## I.    Patent Claims

The use or sale of Tri-Blend directly infringes the patents-in-suit only when Tri-Blend is combined with infant formula, donor milk, fortified breast milk, or some such product or substance that either contains the claimed BMOs or is both "synthetic" and contains the claimed HMOs. (Pl.'s LR 56.1(b)(2) Resp. ¶¶ 18-19, ECF No. 401-1.) In NICUs, Tri-Blend is sometimes mixed with sterile water or 5% glucose water, which mixtures contain no HMOs or BMOs and are therefore not infringing by themselves. Tri-Blend is also sometimes administered with expressed mother's breast milk, which, unlike the processed donor milk used in NICUs, is not "synthetic" and therefore not infringing. (Pl.'s LR 56.1(b)(2) Resp. ¶ 52; *see id.* ¶ 58.) A "Mixing Instructions" video released by Abbott shortly after Tri-Blend's September 2019 launch states that users should prepare the product by pouring it into "3-5 mL breast milk or infant formula." (Abbott's LR 56.1(c)(2) Resp. ¶ 1, ECF No. 411.) Promotional literature from the same time frame stated that "infants can experience the benefits of probiotics in just one sachet per day mixed with breast milk, donor milk or formula." (*Id.* ¶ 3, ECF No. 411 at 38[2].)  Later versions of Abbott's marketing and product information materials instructed users to mix Tri-Blend with "3 mL of breast milk, donor milk, infant formula, sterile water, or 5% glucose water (commercially sterile)." (*Id.* ¶¶ 1-2, ECF No. 411 at 34-38.) One of Evolve's experts, Sarah Butler, surveyed 301 medical professionals, who responded regarding 1,037 patients who had received Tri-Blend under their care, and found that 82.5% of them received Tri-Blend mixed with fortified mother's breast milk, donor milk, or infant formula, *i.e.*, in an allegedly infringing form.

---

[2] Perhaps inadvertently, Abbott left the paragraph numbers out of its Local Rule 56.1 responses (which needlessly complicated and prolonged this Court's review of the briefing and supporting documents). The Court includes references to the CM/ECF pagination for ease of reference.

Abbott cites two prior art references that it contends anticipate the patents-in-suit. In both the 2005 Bin-Nun study and the 2005 Lin clinical trial, researchers added oral probiotics—which included *B. infantis*—to infant formula or donor milk, respectively, to assess the effectiveness of the probiotics in preventing necrotizing enterocolitis (one of the health conditions recited by the '091 patent). (See Def.'s Exs. 26 & 27, ECF No. 392-27 & ECF No. 392-28.) Both studies found that the probiotic supplement reduced the risk of necrotizing enterocolitis.

Asserted Claim 18 of the '872 patent is dependent on Claim 1, which describes a composition consisting of HMOs that have certain stated mass/charge ("m/z") ratios, "wherein the m/z ratio is measured by matrix-assisted laser desorption/ionization (MALDI)." (*Id.* ¶ 34.) One of Evolve's experts, Dr. Rudd, used a different testing method, the liquid chromatography and mass spectroscopy ("LC-MS") method, to perform her analysis. Based on this evidence, Abbott moved to strike Evolve's infringement theory under the doctrine of equivalents—or, alternatively, for leave to amend its final invalidity contentions—and to bar the expert testimony of Dr. Rudd, as well as other expert testimony relating to any theory based on evidence of LC-MS testing. In response, Evolve argued that the use of MALDI testing is not a claim limitation, so it makes little difference whether its expert uses MALDI testing or another testing method:

> Neither patent requires an infringer to conduct any testing, whether by matrix-assisted laser desorption/ionization (MALDI), by liquid chromatography-mass spectrometry (LC-MS), or by any other technique. Rather, Abbott indirectly infringes the patents when it instructs hospital care providers to combine and administer Abbott's product, Similac® Probiotic Tri-Blend ("Tri-Blend"), with other products or substances that contain the identified HMOs and BMOs. (Dkt. 20 ¶¶ 16, 29-31, 44-46.) Nothing more is required. At no point does Abbott, the care provider, or anyone else need to "test" the products or resulting combination in any way.

(Pls.' Opp'n to Def.'s Mot. to Strike at 2, ECF No. 372.) Magistrate Judge McShain, to whom the undersigned had referred this case for discovery supervision, agreed with Evolve, ruling that

MALDI testing is not a claim limitation but "merely the type of testing chosen as an example to measure the important and actual claim elements of the patents, *i.e.*, the oligosaccharides with specific m/z ratios." (Aug. 16, 2024 R & R at 12, ECF No. 395.) Abbott filed objections to Judge McShain's Report and Recommendation, and in response, Evolve adhered to its position, making a similar argument in similar terms. (Pls.' Resp. to Def.'s Objs. to R & R at 6, ECF No. 405.) Similarly, in response to Abbott's motion for summary judgment, Evolve argues, "Abbott indirectly infringes the '872 patent when it instructs others to combine Tri-Blend with the recited HMOs. Nothing more is required." (Pls.'s Omnibus Mem. at 36, ECF No. 401.)

## II.     False Advertising and State-Law Counterclaims

Evolve and Abbott use different strains of *B. infantis*. Tri-Blend consists of a combination of *B. infantis* BB-02 and two other probiotic bacteria. Evolve's product uses its EVC001 strain of *B. infantis*. Abbott has stated in marketing materials and advertisements that Tri-Blend has a "unique blend" of "high-quality probiotic strains," exhibits "potency" and "stability," and has "functional advantages over single strain probiotics." Evolve contends that internal documents show that Abbott has doubts about the "stability" of BB-02 and is aware that *B. infantis*, not the product's other probiotic strains, drives whatever beneficial effects Tri-Blend provides.

Abbott's Tri-Blend product labeling states that each packet contains "1 billion CFU." Evolve contends that this labeling may suggest to some customers that *B. infantis* BB-02 makes up a third of the colony-forming units in each packet, but Abbot cannot verify the proportion of *B. infantis* BB-02 to the other bacteria in Tri-Blend.

Abbott's expert witness, Sarah Butler, surveyed relevant medical professionals by asking them, "Based on information you may have seen or heard, which of the following characteristics, if any, are associated with Similac Probiotic Tri-Blend?" (Pls.' LR 56.1(b)(3) Stmt. of Add'l Facts

¶ 39, ECF No. 401-1 at 78.) A majority of respondents (58.5%) associated "multi-strain probiotic offers functional advantages over single-strain probiotics" with Tri-Blend. Nearly half of respondents associated "stable at room temperature" (49.5%) and "high-quality strain of . . . *B. infantis*" (48.8%) with Tri-Blend. Somewhat fewer respondents associated "equivalent or greater amounts of viable *B. infantis* as the other two probiotics" (34.6%) and "guaranteed potency" (32.9%) with Tri-Blend.

In 2020, Evolve sent letters to neonatologists and pharmacists at a number of hospitals, informing them that it had filed this lawsuit to assert its rights under the patents-in-suit against Abbott and that its patents related to "combinations of *B. infantis* with certain human milk and bovine milk oligosaccharides, including those found in human milk and formula products commonly used in the NICU." (Pls.' LR 56.1(a)(2) Stmt. ¶¶ 38-39, ECF No. 401-1; Def.'s LR 56.2(b)(2) Resp. ¶¶ 38-39, ECF No. 411 at 15-16.)  One such letter read as follows:

> It has come to our attention that Baylor Scott & White Medical Center - McKinney is implementing the administration of Abbott's Similac Probiotic Tri-Blend to patients in its Neonatal Intensive Care Unit. As you may know, Similac Probiotic Tri-Blend is marketed as including *Bifidobacterium longum* subspecies *infantis* (*B. infantis*). Evolve BioSystems, Inc. holds the rights to patents relating to combinations of *B. infantis* with certain human milk and bovine milk oligosaccharides, including those found in human milk and formula products commonly used in the NICU under the current standard of care. Among these patents are U.S. Patent No. 8,197,872, titled "Human Milk Oligosaccharides to Promote Growth of Beneficial Gut Bacteria," and U.S. Patent No. 9,200,091, titled "Bovine Milk Oligosaccharides." Evolve exclusively licenses both patents from the Regents of the University of California. They are enclosed for your reference. Customers of Evolve that purchase Evivo® receive a license to the '872 and '091 patents to use Evolve's proprietary EVC001 *B. infantis* strain in combination with human milk and formula products. Other companies' *B. infantis* products do not include a license to the '872 and '091 patents. Indeed, Evolve and the Regents of the University of California have asserted these patents in Federal Court against Abbott Laboratories regarding its "Tri-Blend" *B. infantis* product. *See Evolve Biosystems, Inc. and the Regents of the University of California v. Abbott Laboratories*, Case No. 1:19-cv5859 (N.D. Ill.).

7

> We respect the desire to choose what you feel is an appropriate product for your patients. If Baylor Scott & White Medical Center - McKinney chooses not to use Evivo®, we are prepared to discuss license options that would grant you access to the '872 and '091 patents for uses that involve another *B. infantis* product. Please let us know how you would like to proceed. If you would like to review Evolve's licensing terms, we can prepare a draft agreement and have that to you shortly.

(Pls.' Ex. 23, ECF No. 401-17.)

## <u>Analysis</u>

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). A genuine dispute is one that could change the outcome of the suit and is supported by evidence sufficient to allow a reasonable jury to return a favorable verdict for the non-moving party. *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010). The Court applies these "ordinary standards for summary judgment" in the same way whether one or both parties move for summary judgment; when the parties file cross-motions, the Court treats each motion individually, "constru[ing] all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017); *see Reeder v. Carter*, 339 F. Supp. 3d 860, 869-70 (S.D. Ind. 2018).

### I. Infringement

Under the Patent Act, anyone who "without authority makes, uses, offers to sell, or sells any patented invention . . . during the term of the patent . . . infringes the patent." 35 U.S.C.

§ 271(a). Additionally, anyone who "actively induces infringement of a patent shall be liable as an infringer." *Id.* § 271(b). And anyone who "offers to sell or sells . . . a component of a patented . . . combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." *Id*. § 271(c).

To reiterate, Evolve does not contend that a *B. infantis* product like Tri-Blend, in isolation, infringes the patents-in-suit; it contends that infringement occurs when end users mix Tri-Blend with a human or bovine milk product that contains the HMOs or BMOs recited by the claims. Evolve's principal theory is that Abbott is liable for indirect infringement because it makes and sells Tri-Blend, knowing and intending that end users will infringe Evolve's patents by mixing it with a milk product such as infant formula, fortified breast milk, or donor milk that contains the recited oligosaccharides. Evolve argues that not only did Abbott instruct its customers to mix Tri-Blend with a milk product that would result in an infringing combination, but also, Butler's survey shows that the vast majority of patients who receive Tri-Blend take it in an infringing form.

To prevail under a theory of indirect infringement, Evolve must establish that Abbott's actions "led to direct infringement" by third parties. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004). It is not enough to show that an accused product is merely "capable" of being used in an infringing way. *Parallel Networks Licensing, LLC v. Microsoft Corp.*, 777 F. App'x 489, 493 (Fed. Cir. 2019) (citing *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1330 (Fed. Cir. 2010)). "In order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily

9

infringes the patent in suit." *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007). It is clear that at least some users of Tri-Blend administered it to patients in an infringing fashion by mixing it with infant formula, fortified breast milk, or donor milk—as Abbott instructed users to do. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd,* 564 U.S. 91 (2011) ("The instructional materials were thus substantial evidence that Microsoft intended the product to be used in an infringing manner."). This is enough to survive summary judgment. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009); *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1325 (Fed. Cir. 2009). Even without the Butler survey, which Abbott has moved to exclude, the evidence is "just adequate" to get Evolve over the summary judgment hump on infringement. *See Lucent*, 580 F.3d at 1318-19. The weakness of the evidence may present damages issues, but for reasons the Court will explain below, it need not reach the issue of damages.

Abbott also argues that it is entitled to summary judgment on any claim of contributory infringement under § 271(c) because undisputed evidence shows that Tri-Blend has substantial noninfringing uses: Tri-Blend is sometimes mixed with sterile water, 5% glucose water, or expressed mother's breast milk, rather than infant formula, donor milk, or fortified breast milk. Evolve responds that these uses are not substantial because it is doubtful whether infants obtain the benefit of Tri-Blend if the product is mixed with water, and expressed mother's breast milk is rarely available to preterm infants receiving Tri-Blend in a NICU. According to Evolve, Tri-Blend was developed and is specifically intended to be used in an infringing manner; even some facially noninfringing uses, such as those that begin by mixing Tri-Blend with water, are ultimately infringing because the ingestion of Tri-Blend results in its combination with a food product containing the recited oligosaccharides in the infant's stomach—or else the Tri-Blend is

10

ineffectual. A jury could conclude based on evidence to this effect that any noninfringing use of Tri-Blend is impractical, ineffectual, and therefore insubstantial. *See i4i*, 598 F.3d at 851. Abbott's motion for summary judgment is denied as to infringement.

## II.    Invalidity

Evolve survives summary judgment on infringement in part because of its success in obtaining, first in other rulings and again here, what amounts to a broad claim construction. That turns out to be a "Pyrrhic victory." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1383 (Fed. Cir. 2007).

"Paramount among the patentability requirements is that that which is sought to be patented must be new." *In re Schoenwald*, 964 F.2d 1122, 1123 (Fed. Cir. 1992). 35 U.S.C. § 102 "embodies the concept of novelty—if a device or process has been previously invented (and disclosed to the public), then it is not new, and therefore the claimed invention is 'anticipated' by the prior invention." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008). The novelty requirement operates to "exclude from consideration for patent protection knowledge that is already available to the public" at the time of a patent application. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 148-49 (1989).

35 U.S.C. § 102 provides that an invention is unpatentable if it was previously "described in a printed publication" or "in public use."[3] "To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently." *Atlas Powder*

---

[3] 35 U.S.C. § 102 was amended by the by the Leahy-Smith America Invents Act ("AIA"), and the amendment became effective prospectively in 2013, after the applications for the '872 and '091 patents had already been filed, so the earlier version of the statute applies. Pub. L. 112-29 § 3(b), (n), 125 Stat. 284, 285-86, 293 (2011). In any event, any differences between the two versions of the statute are immaterial for purposes of this case; the language quoted above appears in both versions, and the test for anticipation has not changed.

*Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999) (internal quotation marks omitted). "[I]f granting patent protection on the disputed claim would allow the patentee to exclude the public from practicing the prior art, then that claim is anticipated, regardless of whether it also covers subject matter not in the prior art." *Id.* Thus, in a sense, the anticipation and infringement issues are mirror images—"it is axiomatic that that which would literally infringe if later anticipates if earlier." *Bristol-Myers Squibb Co. v. Ben Venue Lab'ys, Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001).

"A reference may anticipate inherently if a claim limitation that is not expressly disclosed is necessarily present, or inherent, in the single anticipating reference." *In re Montgomery*, 677 F.3d 1375, 1379-80 (Fed. Cir. 2012) (internal quotation marks omitted). "[I]nherent anticipation does not require a person of ordinary skill in the art to recognize the inherent disclosure in the prior art at the time the prior art is created." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005). "[O]ne of the principles underlying the doctrine of inherent anticipation is to ensure that '[t]he public remains free to make, use or sell prior art compositions or processes, regardless of whether or not they understand their complete makeup or the underlying scientific principles which allow them to operate.'" *Id.* (quoting *Atlas Powder*, 190 F.3d at 1348).

Thus, "[u]nder the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates." *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir. 2002). It makes no difference if the patentee discovers certain "'inherent properties'" of the elements of a known process that the prior art had not appreciated; when the inventor has "done nothing more than recognize properties inherent in certain prior art [elements]," he may have "recognized something quite interesting," but he "simply has not invented anything new." *Id.* at 1350-51 (citing *Titanium Metals Corp. of Am. v. Banner*,

12

778 F.2d 775, 782 (Fed. Cir. 1985)). An invention is anticipated by the prior art if an "inherent result must inevitably result from the disclosed steps." *Montgomery*, 677 F.3d at 1379-80.

Evolve has admitted that "nothing more is required" to infringe its patent than to combine Tri-Blend with a product, such as infant formula or donor milk, that contains the recited BMOs or HMOs. But combining a *B. infantis* product with either infant formula or donor milk is exactly the process described in the Bin-Nun and Lin references. If this is all that is required for infringement, then the patents are invalid as anticipated by those references. To hold otherwise would bar the public from doing what the Bin-Nun and Lin researchers did in those studies. Inventions are not entitled to patent protection under such circumstances. *See Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1379-80 (Fed. Cir. 2003). "To hold otherwise would remove from the public a method" of promoting infant gut health that has been in the public domain for years, as evidenced by the Bin-Nun and Lin references. *King Pharms., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1276 (Fed. Cir. 2010).

To avoid this result, Evolve argues that there are fact issues as to whether ABC Dophilus and Infloran, the *B. infantis* products used in the Bin-Nun and Lin references, actually contained *B. infantis*. Any such issues are immaterial. These references disclosed research involving the use of probiotic products that at least nominally contained *B. infantis*, which is all they need do for purposes of the anticipation issue. Anticipation depends on what the prior art references disclosed, not whether they disclosed an invention that actually worked as claimed in the reference. *Bristol-Myers Squibb*, 246 F.3d at 1378.

Next, Evolve argues that there is no evidence as to whether the infant formula or donor milk used in the Bin-Nun and Lin studies contained the claimed oligosaccharides. The Bin-Nun reference states that the researchers used Abbott's Similac infant formula, but there is no evidence

in the record of Similac's ingredients in 2004. And neither reference discloses testing for specific oligosaccharides.

This argument fares no better because Evolve itself has argued that infringement occurs whenever Tri-Blend is combined with products such as donor milk or infant formula that contain the recited oligosaccharides, without the need for any testing. Specifically, Evolve argues that donor milk contains the HMOs with the mass/charge ratios recited by the '872 patent, citing supporting evidence. (See Pls.' Resp. Br. at 37-38, ECF No. 401 (citing Pls.' LR 56.1(b)(3) Stmt. of Add'l Facts ¶¶ 13-15, ECF No. 401-1); Def.'s LR 56.1(c)(2) Resp. ¶¶ 13-15, ECF No. 411 at 48-49.) Regarding the '091 patent, Evolve cites its expert Dr. Rudd's analysis, which found at least one of the recited BMOs in each of the seven Similac products it tested—and then, revealingly, it argues that, even if Dr. Rudd's testimony is excluded, Evolve nevertheless has sufficient evidence of infringement to survive summary judgment in the evidence that Abbott's Similac products contain bovine milk. (Pls.' Resp. Br. at 42.)

Evolve purports to refute Abbott's assertion that the Similac formula used by the Bin-Nun researchers in 2004 would have contained the recited BMOs, but it does not do so by citing any evidence in the record; it merely states that Abbott has put forth no evidence confirming it. (Pls.' LR 56.1(b)(2) Resp. ¶ 65.) Similarly, it states that Abbott's expert, Dr. Clemens, could not confirm that Similac would have contained the recited BMOs in 2004. This may be true, but it does not save Evolve from summary judgment, as Evolve must do more than suggest that there is some "metaphysical doubt" on the question. *See Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1022 (7th Cir. 2018) (explaining that "the non-movant must set forth specific facts demonstrating a genuine issue for trial," and pointing to evidence of a mere "'metaphysical doubt' is insufficient" to do so) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986);

14

*see also Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 887 (7th Cir. 2023) (explaining that, at summary judgment, a district court need not "disbelieve defendants' proffered evidence simply because [the plaintiff]—without proof—asserts it is false," where the plaintiff does not also come forward with "specific facts" to refute it) (internal quotation marks omitted) (citing *Carroll v. Lynch*, 698 F.3d 561, 565 (7th Cir. 2012), and *Matushita*, 475 U.S. at 587), *vacated on other grounds on denial of reh'g,* No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023)); *see also Novartis Corp. v. Ben Venue Lab'ys, Inc.*, 271 F.3d 1043, 1054 (Fed. Cir. 2001) (affirming summary judgment against patentee who resorted to "theoretical speculation raising, at best, a 'metaphysical doubt as to the material facts'") (quoting *Matushita*, 475 U.S. at 586). Dr. Clemens's testimony does not suggest any reason for genuine doubt as to whether Similac formula contained the recited BMOs in 2004; he stated that it is "likely" that Similac did have the recited BMOs in 2004 because it was "milk based." (Pls.' LR 56.1(b)(3) Stmt. of Add'l Facts ¶ 26.) This testimony is entirely consistent with Evolve's infringement theory, which, as Dr. Clemens explained, depends on the recited BMOs being found in "bovine milk." (*See* Defs.' Ex. 6, Clemens Report ¶ 238, ECF No. 393-6 at 108 (citing Pls.' Final Infringement Contentions at B1-3–B1-8, ECF No. 355-2 at 40-45 (contending that Similac products infringe the '091 patent because they contain bovine milk, which, "when properly preserved and processed, contains many [BMOs,] including the claimed [BMOs]")); *see also* Defs.' Ex. 8, Clemens Reply Report ¶¶ 66-74, ECF No. 393-8 at 20-25; Pls.' Final Infringement Contentions ¶ VI, ECF No. 355-2 at 3-4 (stating that "[s]ynthetic, prebiotic products made from human milk, such as products sold by Prolacta and Medolac, are 'breast milk' products containing the recited human milk oligosaccharides," and "products made from bovine milk, such as Abbott's Similac line of products (including fortifiers), are 'infant formula' containing the recited bovine oligosaccharides").)

In other words, Evolve has effectively embraced and "adopt[ed] the same assumption that it criticizes" with this argument. *See Seoul Viosys Co. v. P3 Int'l Corp.*, No. 16-CV-6276, 2018 WL 4759744, at \*9 (S.D.N.Y. Sep. 30, 2018), *opinion clarified on denial of reconsideration,* 2019 WL 3858621 (S.D.N.Y. Aug. 16, 2019), *aff'd without op.,* 810 F. App'x 903 (Fed. Cir. 2020). Evolve "cannot have it both ways"—it "cannot recover for infringement" by pointing to the combination of *B. infantis* with infant formula or donor milk "if these same [methods] existed in prior art." *Gammino v. Sw. Bell Tel., L.P.*, 512 F. Supp. 2d 626, 637 (N.D. Tex. 2007), *aff'd without op.,* 267 F. App'x 949 (Fed. Cir. 2008); *see SmithKline*, 403 F.3d at 1343 (explaining that an accused infringer seeking to establish invalidity by anticipation need demonstrate only that "the disclosure of the prior art is sufficient to show that the natural result flowing from the operation as taught in the prior art would result in" infringement); *id.* at 1341-42; *CommScope Techs. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1298-99 (Fed. Cir. 2021) (reasoning that patentee cannot claim infringement based on a particular element and "simultaneously argue" against anticipation, notwithstanding that the prior art discloses an element that "operates identically," because a 'patent may not, like a nose of wax, be twisted one way to avoid anticipation and another to find infringement'") (quoting *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001)); *cf. 01 Communique Lab'y, Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 742 (Fed. Cir. 2018) (noting that there is "nothing improper" in accused infringer arguing that it has not infringed, but if patentee "attempt[s] to expand the scope of its claims . . . then the claims would be invalid in light of the prior art"); *see also Gammino v. Sprint Commc'ns Co. L.P.*, No. CIV. 10-2493, 2011 WL 3240830, at \*6 (E.D. Pa. July 29, 2011) ("The court, using [the patentee's] *own* interpretation, then determined the products[' patents] were invalid [as anticipated]. That approach is fully consistent with the precedent of the Federal Circuit.").

16

Even if it is true, for some reason that Evolve does not specify, that not every feeding that the Bin-Nun and Lin researchers performed involved a bottle of infant formula or donor milk that actually contained a claimed oligosaccharide, that makes no difference. As Abbott argues, even if the process disclosed in the prior art "sometimes, but not always embodies a claimed method," *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003), it nevertheless anticipates the method by disclosing it to the public. *See King*, 616 F.3d at 1276 ("To anticipate, the prior art need only meet the inherently disclosed limitation to the extent the patented method does."). If Evolve's patented methods "disclose no more than" combining *B. infantis* with the recited oligosaccharides, then "the identical prior art method[s] do as well." *See id.* Evolve argues that this case is different from the cases relied on by Abbott because, given that the allegedly anticipatory references do not disclose oligosaccharides, "it is questionable whether [the prior art] *ever* discloses the claimed method." (Pls.' Resp. Br. at 53.) But by asserting that infringement occurs simply by combining Tri-Blend with a product such as Prolacta donor milk or Similac formula, Evolve has resolved the question itself. *See Seoul Viosys*, 2018 WL 4759744, at *8-9. And, as Judge McShain recognized in recommending a ruling against Abbott and for Evolve, "parties must live with the consequences of the strategic decisions they and their lawyers make." *See R-Boc Representatives, Inc. v. Minemyer*, 66 F. Supp. 3d 1124, 1126 (N.D. Ill. 2014).

The Federal Circuit once explained the principle of inherency as follows:

> Humans lit fires for thousands of years before realizing that oxygen is necessary to create and maintain a flame. The first person to discover the necessity of oxygen certainly could not have obtained a valid patent claim for 'a method of making a fire by lighting a flame in the presence of oxygen.' Even if prior art on lighting fires did not disclose the importance of oxygen and one of ordinary skill in the art did not know about the importance of oxygen, understanding this law of nature would not give the discoverer a right to exclude others from practicing the prior art of making fires.

17

*EMI Grp. N. Am., Inc. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1351 (Fed. Cir. 2001). By disclaiming any need for testing to determine infringement, Evolve becomes like the person who claims that his method of making fire is new because he has discovered the importance of oxygen—notwithstanding that the method has been practiced for ages. To take the analogy a step further, it is as if the discoverer in the Federal Circuit's hypothetical argued that his method is new because it requires oxygen, and there is no proof that past fires depended on oxygen—but there is no need to prove that any accused infringers' fires depend on oxygen because all the patented method requires is to make a fire. This logic is untenable; if making a fire is all it takes to infringe, then the method is *not* new. Similarly, while the patents-in-suit may represent the discovery of "something quite interesting" about probiotics and infant gut health, if they can be infringed just by combining *B. infantis* with infant formula or donor milk, then they do not represent the "invent[ion of] anything new." *Cruciferous Sprout*, 301 F.3d at 1351 (citing *Titanium Metals*, 778 F.2d at 782).

The Bin-Nun and Lin references disclose combining *B. infantis* with infant formula and donor milk. Because Evolve successfully contends that that is all that is necessary for infringement, its asserted claims are invalid as anticipated under 35 U.S.C. § 102. *See Liebel-Flarsheim*, 481 F.3d at 1383. Abbott's motion for summary judgment is therefore granted on the issue of anticipation. That ruling suffices to resolve the parties' patent claims. Abbott raises numerous other bases for invalidity, as well as a derivation defense, but the Court need not reach these other issues. The parties' motions to exclude expert testimony are likewise denied as moot, as is Evolve's cross-motion as it relates to the parties' patent claims.

## III. False Advertising and State-Law Counterclaims

Section 43(a) of the Lanham Act provides as follows:

18

**(1)** Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

. . .

**(B)** in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). "This portion of § 43(a) provides the basis for what are generally known as 'false advertising,' 'trade libel,' and 'product disparagement' claims." *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1347 (Fed. Cir. 1999).

To prevail under section 43(a)(1)(B), the parties must prove the following elements:

(1) a false statement of fact by the defendant in a commercial advertisement [or promotion] about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999). False advertising claims may be based on statements or misrepresentations that are either (1) literally false, or (2) ambiguous or literally true, but misleading in context, as shown by actual consumer deception. *Id.* When the challenged statement is literally false, there is no need to show that the statement "actually deceived customers or was likely to do so." *Id.* When the challenged statement is ambiguous or literally true, the claimant's success "'usually turns on the persuasiveness of a consumer survey.'" *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 948 (N.D. Ill. 2009) (quoting *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992)); *see* 4 McCarthy on Trademarks and Unfair Competition § 27:56 (5th ed.).

Claims of misleading—rather than literally false—statements "should be tested by public reaction" and "district courts *must* rely on extrinsic evidence," such as surveys, "to support a finding" for the claimant. *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999) (Sotomayor, J.) (internal quotation marks omitted).

Each side asserts claims of false advertising under the Lanham Act. Each side also asserts parallel claims of unfair competition under Illinois and California law, and, as the previously assigned judge explained in an earlier opinion, these claims rise or fall with the Lanham Act claims. *Evolve Biosystems, Inc. v. Abbott Lab'ys*, No. 19 C 5859, 2022 WL 846900, at *4 (N.D. Ill. Mar. 22, 2022), ECF No. 224. Additionally, Abbott asserts state-law claims of interference with contractual relations and intentional interference with prospective economic advantage, and Evolve asserts the same claims against Abbott. Abbott's motion appears not to encompass these latter claims (*see* Def.'s Omnibus Mem. at 31, ECF No. 391 (referring only to "Counts I-III of Evolve's Counterclaim")), but Evolve's does (*see* Pl.'s Omnibus Mem. at 18 (referring to "Counts I-V" of Abbott's counterclaim)).

Neither side has come forward with sufficient evidence to survive the other's motion for summary judgment on their false advertising and related state-law claims.

## A. Statements in Abbott's Marketing Materials and Labeling

Abbott argues that Evolve cannot prevail on its claims that Abbott falsely advertised certain benefits of Tri-Blend because there is no evidence that the representations it challenges—vague statements that Tri-Blend has a "unique blend" of "high-quality probiotic strains," exhibits "potency" and "stability," and has "functional advantages over single strain probiotics," and an alleged suggestion that there is as much *B. infantis* in Tri-Blend as any other probiotic—are false, whether (a) literally or (b) implicitly, based on actual consumer confusion.

20

Evolve responds by citing certain internal documents produced by Abbott suggesting that Abbott was aware that its BB-02 strain was "sensitive" and there were "stability" issues, as well other evidence that Abbott could not verify the live cell count of BB-02 in Tri-Blend, although it knew that it was the most important strain in the product. (Pls.' Resp. Br. at 59-60; Pls.' LR 56.1(b)(2) Resp. ¶ 75,[4] ECF No. 401-1 at 59; Pls.' LR 56.1(b)(3) Stmt. of Add'l Facts ¶ 11, ECF No. 401-1 at 69.) But none of this demonstrates literal falsity, which is reserved for unambiguous messages. "A 'literal' falsehood is bald-faced, egregious, undeniable, over the top." *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 513 (7th Cir. 2009). "The proper domain of 'literal falsity' as a doctrine that dispenses with proof that anyone was misled or likely to be misled is the patently false statement that means what it says to any linguistically competent person." *Id.* "The inquiry asks whether the defendant made an explicit representation of fact that on its face conflicts with reality." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (7th Cir. 2018). Evolve has not pointed to evidence that would warrant a reasonable factfinder in concluding that Abbott's statements were literally false, in the sense that they made an explicit representation of fact that was patently false, *i.e.*, that on its face conflicts with reality. *See Schering-Plough*, 586 F.3d at 513 (statement that a pharmaceutical product was "Rx Only," when not all versions of that pharmaceutical product were available only by prescription, but the product in question was actually obtained by prescription, was not literally false).

Because the challenged statements are not literally false, Evolve is required to rely on evidence of actual consumer deception. Evolve points to the testimony of one of Abbott's experts, Dr. Mikael, and the Butler survey. This evidence does not get Evolve over the summary judgment

---

[4] Evolve purports to cite a document suggesting that "individual strain[s] are listed in descending order by CFUs," but the Court cannot find the cited statement on the page cited.

hump. First, Dr. Mikael is a neonatologist who administered Tri-Blend to patients, and he can testify as to how he understood Abbott's statements, for whatever that is worth. But it is not worth much; he disclosed no expert opinion on how other medical professionals in the field would understand the challenged statements, nor does the Court see how his medical expertise would qualify him to speak for other relevant professionals, at least not broadly enough to provide useful evidence of implied falsity. *See LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 950 (N.D. Ill. 2009) (stating that a false advertising plaintiff must "establish that a statistically significant portion of the target audience received" an implicitly false message to survive summary judgment) (citing *Johnson & Johnson * Merck*, 960 F.2d at 298); *see also LG Elecs.*, 661 F. Supp. 2d at 951-52 (describing standards for expert testimony on consumer confusion).

That leaves the Butler survey—which Abbott has challenged as unreliable and therefore inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702. Even assuming it is reliable and admissible, the Butler survey establishes only that consumers "associated" certain statements with Tri-Blend. The Court fails to see how those findings, even if fully credited, would warrant a reasonable jury in concluding that the challenged statements are false; at most, it shows that consumers are aware of how Abbott has advertised Tri-Blend. Evolve has to prove not just that the challenged statements are subject to misinterpretation or misunderstanding; it has to prove that they are *misleading*. *Mead Johnson & Co. v. Abbott Lab'ys*, 201 F.3d 883, 886 (7th Cir. 2000). The Butler survey does not tend to prove that the challenged statements convey any false message to Abbott's customers; it sheds no light on how they understand the statements at all. *Cf. LG Elecs.*, 661 F. Supp. 2d at 952-53, 956 (denying summary judgment on implied falsity claim based on consumer survey that "addresse[d] a question" about the "message" that "consumers take away" from the defendant's advertising,

namely, whether the defendant's product uses "steam" as an initial matter or merely adds water that is later heated and becomes steam). Therefore, the Butler survey does not aid Evolve.

Evolve has not come forward with evidence that would warrant a reasonable jury in returning a verdict in its favor on its false advertising claim. The Court therefore grants Abbott's motion for summary judgment on this claim. Summary judgment is likewise granted for Abbott on Evolve's state-law unfair-competition claims.

### B. Evolve's Letters to Providers

Evolve moves for summary judgment on Abbott's false advertising claim on largely different grounds, arguing that Abbott cannot prevail because Evolve's 2020 letters to providers about the patents-in-suit represented good-faith attempts to communicate patent rights to potential infringers. Because the Patent Act protects a patentee's right to communicate its patent rights, *see* 35 U.S.C. § 287, a patentee may not be held liable under § 43(a) of the Lanham Act or state law for representations about infringement or the scope of patent rights, unless the communications were "undertaken in bad faith." *Zenith*, 182 F.3d at 1353-54. Abbott responds that Evolve plainly overstated the scope of its patent rights in these letters, suggesting that *any* combination of *B. infantis* with *any* "human milk and fomula products" would infringe the patents, and this overstatement was not only literally false, it was so blatant as to permit an inference of bad faith.

Abbott's claim centers on the following statement in Evolve's letters: "Evolve BioSystems, Inc. holds the rights to patents relating to combinations of *B. infantis* with certain human milk and bovine milk oligosaccharides, including those found in human milk and formula products commonly used in the NICU under the current standard of care." (Pls.' LR 56.1(a)(2) Stmt. ¶¶ 38-39, ECF No. 401-1; Def.'s LR 56.2(b)(2) Resp. ¶¶ 38-39, ECF No. 411 at 15-16.) According to Abbott, this statement is literally false because Evolve did not hold the rights to patents that would

be infringed by just any use of *B. infantis*; Evolve concedes that the patents-in-suit are not infringed when Tri-Blend is combined with expressed mother's breast milk, for example, and Tri-Blend can be used in other ways, including by mixing it with sterile water.

"Although bad faith in this context has both objective and subjective elements, the former is a threshold requirement: a bad faith standard cannot be satisfied in the absence of a showing that the claims asserted were objectively baseless, meaning no reasonable litigant could realistically expect to prevail in a dispute over infringement of the patent." *Judkins v. HT Window Fashion Corp.*, 529 F.3d 1334, 1338 (Fed. Cir. 2008) (internal quotation marks omitted); *see Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 n.5 (Fed. Cir. 2008) ("[T]he 'objectively baseless' standard applies to publicizing a patent in the marketplace as well as to pre-litigation communications."). Abbott's argument that Evolve's letters met this standard centers on the letters themselves: Abbott contends that Evolve overstated its patents rights so egregiously that they are "literally false." (Def.'s Omnibus Resp./Reply at 23, ECF No. 409.)

But the plain text of the letters does not support Abbott's reading. Certainly, Evolve did not make an "explicit representation of fact that on its face conflicts with reality." *Eli Lilly*, 893 F.3d at 382. The text did not state that all uses of *B. infantis* infringed its patents; it stated that Evolve "holds the rights to patents relating to combinations of *B. infantis* with" certain HMOs and BMOs, "including those found in human milk and formula products commonly used in the NICU." Interpreting that statement to mean (falsely) that the claimed BMOs and HMOs were found in *all* "human milk and formula products" that are used in all NICUs is to read something into the text that does not appear on its face. Indeed, it would be just as natural, if not more natural, to interpret the phrase, "found in human milk and formula products commonly used in the NICU," to mean that the claimed oligosaccharides are found in at least *some* such products that are used in at least

24

*some* NICUs, not necessarily all of them. Similarly, the plain text of Evolve's letters does not state that other uses of *B. infantis*, such as combining it with sterile water or 5% glucose water, would infringe Evolve's patents. The facial meaning is simply that the patents are infringed when *B. infantis* is combined with "human milk and formula products commonly used in the NICU."

There is nothing in the text of the letters to support Abbott's argument that Evolve made a breathtakingly broad assertion of patent rights in its letters, exceeding even its assertion of patent rights in this case. To the contrary, the letters are fairly consistent with Evolve's litigation of this case. And Abbott has cited no extrinsic evidence to support its particular interpretation of the letter. It points to nothing other than the barest anecdotal evidence that some customers seemed to think that any use of *B. infantis* would infringe the patents-in-suit. (*See* Def.'s Omnibus Resp./Reply Br. at 26, ECF No. 409.[5]) Abbott points to no consumer survey evidence or anything like it. The best Abbott can do is to cite deposition testimony suggesting that the drafters of the Evolve letters intended to use broad, inclusive language to describe the potentially infringing uses of a *B. infantis* product. But even if Evolve's broad language might be subject to misinterpretation by some customers, the evidence is a far cry from anything that might permit a reasonable juror to conclude that Evolve's letters took an "objectively baseless" position on the scope of its patent rights. *Cf. Veolia Water Sols. & Techs. N. Am., Inc. v. Aquatech Int'l Corp.*, 123 F. Supp. 3d 695, 701 (W.D. Pa. 2015) (finding a triable issue of fact on bad faith issue when evidence showed that patent licensee's attorney had admitted that the process in question "could not possibly infringe" the patent in suit). Because Evolve did not blatantly exaggerate the scope of the patents-in-suit,

---

[5] The Court cannot even find in the record the exhibit that Abbott purports to cite. Even if the Court assumes that the evidence that Abbott describes in its brief actually exists, and even if it says what Abbott claims that it says, it is nowhere near enough for Abbott's false advertising claim to survive summary judgment.

Abbott's cases, *Crocs, Inc. v. Effervescent, Inc.*, 119 F.4th 1, 4 (Fed. Cir. 2024), and *Soilworks, LLC v. Midwest Indus. Supply, Inc.*, 575 F. Supp. 2d 1118, 1126 (D. Ariz. 2008),[6] are inapposite.

Of course, in the end, the Court has concluded that Evolve's patents are invalid as anticipated, so in truth, Evolve did assert broader patent rights than it had. But to conclude that the letters were therefore "objectively baseless" would be to fall prey to hindsight bias. It took years of litigation during which the parties developed and refined their theories on the various issues this case presents before their infringement and invalidity positions settled into the balance that resulted in the Court's conclusion that the patents-in-suit are invalid as anticipated. The Court fails to see what evidence would permit a reasonable juror to conclude that Evolve could not reasonably have hoped to prevail in this case when it sent the letters in 2020. *See Hyperphrase Techs., LLC v. Google Inc.*, No. 06-C-199-S, 2007 WL 5345658, at *1 (W.D. Wis. Feb. 14, 2007) (explaining that an accused infringer's mere "hindsight reliance on the summary judgment decision in its favor" did not suffice to demonstrate that the patentee had brought the case in bad faith, when an "objective view of the entire file and the conduct of [the] litigation suggest[ed] to the contrary that [the] plaintiff commenced the action in good faith believing that it could prevail on the broad claim construction it advanced"). Evolve's motion for summary judgment is granted as to Abbott's false advertising and state-law counterclaims.

---

[6] The Court also notes that *Soilworks*, 575 F. Supp. 2d at 1126, has been criticized for suggesting incorrectly that something less than objective baselessness is necessary when the statements at issue are "marketplace statements" as opposed to "pre-litigation communications." 5 Matthews Annotated Patent Digest § 34:79 (criticizing *Soilworks* for "appear[ing] to have overlooked" *Dominant Semiconductors*, 524 F.3d at 1260 n.5, on this point).

**Conclusion**

Abbott's motion for summary judgment and the exclusion of expert testimony [389] is granted in part. The Court grants the motion for summary judgment for Abbott and against Evolve on the patent claims and on Evolve's false advertising and unfair competition claims; it denies the motion as moot as to the exclusion of expert testimony. The Court declares that the asserted claims of the '872 patent and '091 patent are invalid under 35 U.S.C. § 102 as anticipated. Evolve's cross-motion for summary judgment and the exclusion of expert testimony [399] [401] is granted in part and denied in part. The Court grants Evolve's motion for summary judgment on Abbott's false advertising and state-law counterclaims; the motion is otherwise denied as moot.

The motions to seal [394] [402] [412] [421] are granted because the parties have filed reasonably redacted versions of the sealed documents and, to the extent that they underpinned the Court's decision on summary judgment, the Court has revealed the substance of those documents in this opinion.

Judge McShain's Report and Recommendations of August 16, 2024 [395] and August 30, 2024 [397] are adopted. Abbott's objections [398] [404] are overruled because the Court finds Judge McShain's reasoning persuasive as to the issues pertinent to its decision on summary judgment; to the extent the objections concern issues immaterial to the Court's summary judgment decision, they are overruled as moot.

The parties shall file a status report within a week of the date of entry of this Memorandum Opinion and Order to notify the Court of their positions on whether to proceed to trial on Evolve's remaining counterclaims according to the previously set schedule, or whether an adjustment of the schedule is appropriate in light of this ruling.

**SO ORDERED.**                              **ENTERED:  January 7, 2025**

**JORGE L. ALONSO**
**United States District Judge**